# In the United States Court of Appeals for the First Circuit

---

**UNITED STATES OF AMERICA,**
*Appellee,*

v.

**ALEXIS D. NEGRON-CRUZ,**
*Defendant-Appellant.*

---

On Appeal from the United States District Court
for the District of Puerto Rico
D. Ct. No. 11-cr-229-FAB
Hon. Francisco A. Besosa, U.S. Senior District Judge

---

## APPELLANT'S OPENING BRIEF

---

**RACHEL BRILL**
Federal Public Defender
District of Puerto Rico
241 F.D. Roosevelt Ave.
San Juan, PR 00918
T. (787) 281-4922
F. (787) 281-4899
E. Kevin_Lerman@fd.org

**FRANCO L. PÉREZ-REDONDO**
Assistant Federal Public Defender
Supervisor, Appeals Section

**KEVIN E. LERMAN**
Assistant Federal Public Defender

*Attorneys for Defendant-Appellant*
**ALEXIS D. NEGRÓN-CRUZ**

# Contents

Authorities ..................................................................................................iv

Jurisdiction ................................................................................................1

Issues ..........................................................................................................2

Statement ....................................................................................................3

    A.    Introduction ........................................................................................3

    B.    Released subject to the same internet-hindering framework as before, Negrón was never authorized to access the internet on any device from his November release through his January arrest........................................................................................... 4

    C.    Electing not to follow Judicial Conference guidance to seek revocation, Probation sought Negrón's arrest and revocation in an unsworn narrative unbacked by an oath or affirmation................... 9

    D.    Given the events now catalogued in *Negrón-Cruz*, Negrón sought to preclude ex parte contact with fact-witness Lozada. ..........10

    E.    Arguing the gravamen of revocation allegations related to unconstitutional conditions, Negrón sought dismissal of Lozada's unsworn motion................................................................. 11

    F.    The revocation court defended its joint adjudication with fact-witness Lozada, and sentenced Negrón to an upward variance based in part on Lozada's conclusion that Negrón was defiant and the court's conclusion that Negrón's critiques of probation and the court meant he was further defiant. ...................................... 13

    G.    Negrón renewed his objections and appealed. ................................... 16

Summary of the Arguments .......................................................................... 17

Arguments ................................................................................................ 20

I.    As applied, the court's internet-access restriction conditions, imposed an impermissible internet ban. ......................... 20

i

II.    AS APPLIED, THE COURT'S INTERNET-ACCESS RESTRICTION
       CONDITIONS VIOLATED EQUAL PROTECTION. ..................................21

III.   THE COURT'S CO-ADJUDICATION WITH FACT-WITNESS LOZADA
       BEFORE THE START OF THE CONTESTED HEARING AND DURING A
       CONTINUANCE VIOLATES *MORRISSEY*. ..........................................23

IV.    THE 24-MONTH SENTENCE IMPOSED ON NEGRÓN IS UNLAWFUL AS IT
       EXCEEDS THE APPLICABLE STATUTORY MAXIMUM. .......................34

       A.    The maximum-revocation-sentence statute must be read to
             impose an aggregate maximum reimprisonment term. ......................34

             1.    A plain reading of § 3583(e)(3) still supports aggregating multiple
                   violations. ...............................................................................37

             2.    Even if the text of § 3583(e)(3) is ambiguous, legislative and due
                   process concerns favor aggregation of prior terms to calculate new
                   allowable sentences. .............................................................. 42

                   a.    The 2003 amendment did not transcend existing legislative
                         intent to impose an aggregate cap on revocation-based
                         reimprisonment. .......................................................... 42

                   b.    Reading away an aggregate reimprisonment term would
                         render prominent statutory language superfluous and would
                         ignore the structure of § 3583............................................43

                   c.    Policy reasons support an aggregate cap on supervised
                         release-based reimprisonment......................................... 44

                   d.    The presumption against implied repeal supports an
                         aggregate reimprisonment cap. ........................................46

             3.    The rule of lenity compels the conclusion that an aggregate cap
                   remains. ....................................................................................49

       B.    Should § 3583(e)(3) be read to allow repeated resetting of the
             statutory maximum revocation sentence, it violates the Fifth
             and Sixth amendments....................................................................50

V.    THE DISTRICT COURT ERRED IN SENTENCING NEGRÓN BASED ON STATEMENTS HE MADE THAT WERE CRITICAL OF U.S. PROBATION AND THE COURT ............................................................................................. 52

CONCLUSION ......................................................................................................... 55

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

ADDENDUM

# AUTHORITIES

## U.S. SUPREME COURT AUTHORITIES

*Apprendi v. New Jersey,*
530 U.S. 466 (2005) ................................................................ 51

*Arizona v. Fulminante,*
499 U.S. 279 (1991) ................................................................ 33

*Bifulco v. United States,*
447 U.S. 381 (1980) ................................................................ 49

*Bolling v. Sharpe,*
347 U.S. 497 (1954) ................................................................ 22

*Carpenter v. United States,*
585 U.S. 296 (2018) ................................................................ 21

*Corley v. United States,*
556 U.S. 303 (2009) ................................................................ 43

*Dawson v. Delaware,*
503 U.S. 159 (1992) ................................................................ 52

*Elrod v. Burns,*
427 U.S. 347 (1976) ................................................................ 21

*Erlenbaugh v. United States,*
409 U.S. 239 (1972) ................................................................ 40

*Gagnon v. Scarpelli,*
411 U.S. 778 (1973) ............................................................ 26, 28

*Griffin v. Illinois,*
351 U.S. 12 (1956) ................................................................ 23

*Lehr v. Roberson,*
463 U.S. 248 (1983) ................................................................ 22

*Moskal v. United States,*
498 U.S. 103 (1990) ................................................................ 49

*Offutt v. United States,*
348 U.S. 11 (1954) ................................................................ 32

*Parker Drilling Mgmt. Servs., v. Newton,*
587 U.S. 601 (2019) ................................................................ 28

*Riley v. California,*
573 U.S. 373 (2014) ................................................................ 21

*Simpson v. United States,*
435 U.S. 6 (1978) ............................................................ 49, 50

*Tate v. Short,*
 401 U.S. 395 (1971) ................................................................ 22
*Tumey* v. *Ohio,*
 273 U.S. 510 (1927) ............................................................ 32, 34
*Turner Broad. Sys., Inc. v. FCC,*
 512 U.S. 622 (1994) ................................................................ 52
*United States v. Booker,*
 543 U.S. 220 (2005) ................................................................ 51
*United States v. Granderson,*
 511 U.S. 39 (1994) ................................................................ 49
*Williams v. Illinois,*
 399 U.S. 235 (1970) ................................................................ 22
*Withrow v. Larkin,*
 421 U.S. 35 (1975) ................................................................ 25

## U.S. APPELLATE COURT AUTHORITIES

*Shea v. United States,*
 976 F.3d 63 (1st Cir. 2020) ..................................................... 36
*United States v. Álvarez-Núñez,*
 828 F.3d 52 (1st Cir. 2016) ..................................................... 53
*United States v. Becerra,*
 835 F. App'x 751 (5th Cir. 2021) .............................................. 21
*United States v. Clark,*
 784 F. App'x 190 (5th Cir. 2019) .............................................. 21
*United States v. Collazo-Castro,*
 660 F.3d 516 (1st Cir. 2011) ................................................... 30
*United States v. Cunningham,*
 800 F.3d 1290 (11th Cir. 2015) ................................................ 36
*United States v. De La Cruz,*
 998 F.3d 508 (1st Cir. 2021) ......................................... 40, 44, 48
*United States v. Duke,*
 788 F.3d 392 (5th Cir. 2015) ................................................... 21
*United States v. Epstein,*
 620 F.3d 76 (2d Cir. 2010) ..................................................... 44
*United States v. Frederickson,*
 988 F.3d 76 (1st Cir. 2021) ...................................................... 5
*United States v. Hampton,*
 633 F.3d 334 (5th Cir. 2011) ................................................... 36

*United States v. Hunt,*
    673 F.3d 1289 (10th Cir. 2012) .................................... 36
*United States v. Jones,*
    471 F.3d 478 (3d Cir. 2006) ........................................ 49
*United States v. Luna-Díaz,*
    222 F.3d 1 (1st Cir. 2000) ......................................... 49
*United States v. Merced,*
    263 F.3d 34 (2d Cir. 2001) ........................................ 45
*United States v. Negrón-Cruz,*
    153 F.4th 90 (1st Cir. 2025) .................................. *passim*
*United States v. Padilla,*
    415 F.3d 211 (1st Cir. 2005) (en banc) ......................... 33
*United States v. Peterson,*
    248 F.3d 79 (2d Cir. 2001) ........................................ 21
*United States v. Reccko,*
    151 F.3d 29 (1st Cir. 1998) ........................................ 27
*United States v. Shabazz,*
    633 F.3d 342 (5th Cir. 2011) ...................................... 40
*United States v. Tanco-Pizarro,*
    892 F.3d 472 (1st Cir. 2018) ...................................... 34

## LEGISLATIVE RECORDS

BOP, Notice, 68 Fed. Reg. 19228 (April 18, 2003) ................. 48
CBO, Cost Estimate: S. 151 Prosecutorial Remedies and Tools Against the Exploitation of Children Today Act of 2003, Feb. 19, 2003, ........ 47
H.R. Conf. Rep. 108-66 (April 9, 2003) ............................. 47
Lifetime Consequences for Sex Offenders Act of 2002,
    148 Cong. Rec. H3871-01 (2002) .................................. 47
S. Rep. No. 108-2 (Feb. 11, 2003) .................................. 46
Violent Crime Control and Law Enforcement Act of 1994,
    Pub. L. No. 103-322 (1994) ....................................... 36

## U.S. Statutes

18 U.S.C. § 3231 .................................................................. 1
18 U.S.C. § 3583 .................................................... 1, 2, 25, 28
18 U.S.C. § 3583(k) ............................................................. 48
18 U.S.C. § 3742(a) .............................................................. 1
28 U.S.C. § 1291 .................................................................. 1

## Federal Rules of Procedure

Fed R. Crim. P. 32.1(b)(2) ................................................. 26
Fed. R. Crim. P. 32(e)(1) ................................................... 27
Fed. R. Crim. P. 32(e)(3) ................................................... 27

## U.S. District Court Cases

U.S. Const. amend. I .................................................... *passim*
U.S. Const. amend. V ........................................................ 51
U.S. Const. amend. VI ....................................................... 51

## State Court Cases

*State v. Stewart*,
    No. W2009-00980-CCA-R3-CD,
    2010 Tenn. Crim. App. LEXIS 691 (Tenn. Crim. App. Aug. 18, 2010) ....... 29

# In the United States Court of Appeals for the First Circuit

---

UNITED STATES OF AMERICA,
*Appellee,*

v.

ALEXIS D. NEGRON-CRUZ,
*Defendant-Appellant.*

---

On Appeal from the United States District Court
for the District of Puerto Rico
D. Ct. No. 11-cr-229-FAB
Hon. Francisco A. Besosa, U.S. Senior District Judge

---

## APPELLANT'S OPENING BRIEF

---

TO THE HONORABLE COURT:

The defendant-appellant, Alexis D. Negrón-Cruz, represented by the Federal Public Defender for the District of Puerto Rico, through undersigned counsel, respectfully states and prays:

## JURISDICTION

Negrón appeals from the district court's December 18, 2024 judgment revoking his supervised-release term. AD3-AD8.[1] On December 20, 2024, Negrón's revocation-hearing counsel timely appealed. A213.

Jurisdiction lay in the District of Puerto Rico under 18 U.S.C. §§ 3231 and 3583. Jurisdiction lies in this Court of Appeals under 28 U.S.C. § 1291 and 18 U.S.C. § 3742(a), as those statutes permit appeal from all final district-court decisions and sentences.

---

[1] Citations: Appendix ("A__"), Addendum ("AD__"), ECF entries from D.P.R. Case No. 11-cr-229-FAB ("ECF No. __").

**I.** As applied, are Special Conditions 31 and 32—which prohibit personal internet access without third-party monitoring software—improper under the First Amendment?

**II.** As applied, are Special Conditions 31 and 32—which prohibit personal internet access without third-party monitoring software—improper under Equal Protection?

**III.** Did the court's ex parte co-adjudication with fact-witness probation personnel violate the Fifth Amendment and Rule 32.1?

**IV.** Should Appellant's prior revocation sentences be aggregated toward the statutory maximum under 18 U.S.C. § 3583(e)(3) such that no further imprisonment was authorized?

**V.** Did the district court violate the First Amendment in sentencing where it imposed a higher sentence in response to Appellant's criticism of U.S. Probation in the district court?

## A.    Introduction

Following revocation proceedings held on November 9, 2023, Negrón returned to the community.

Various issues from the November 2023 proceedings were appealed in Case Number 23-1976. This Court affirmed in *United States v. Negrón-Cruz*, 153 F.4th 90 (1st Cir. 2025). For convenience, we refer to that opinion as *Negrón-Cruz I* with pin cites to the official reporter pages.

Indigent still, Negrón was brought to reside in a men's shelter run by Guara Bi, Inc., under contract with U.S. Probation. The shelter is in a remote area of Caguas, Puerto Rico. From his November 9, 2023 release, through his January 10, 2024 arrest, a 62-day period, Negrón was never given permission to utilize the internet.

Following his arrest—for, inter alia, having phones capable of internet access in violation of internet-access restrictions—Negrón sought to preclude ex parte contact between the district court and fact-witness Jose Lozada who was Negrón's probation officer. The district court denied that request, found violations at a contested hearing, and sentenced Negrón to 24 months' imprisonment along with a new supervised release term with all the same conditions. It then challenges the constitutionality of an internet-restricting condition as applied here to deprive lawful

access to the internet. This brief then challenges the court's ex parte co-adjudication procedure as unconstitutional and in conflict with applicable positive law. Finally, it argues the 24-month sentence is unlawful for two reasons. First, it improperly punished Negrón for statements protected under the First Amendment, namely statements critical of U.S. Probation and the district court. Second, since Negrón had already served an aggregate 24 months' imprisonment across prior violations, no further imprisonment should have been imposed.

**B.** **Released subject to the same internet-hindering framework as before, Negrón was never authorized to access the internet on any device from his November release through his January arrest.**

On November 9, 2023, as Negrón was facing revocation for alleged technical violations of his supervised release term, the government's only fact witness against him conferred with the district court ex parte and the judge and the officer "both agreed that the best thing to do would be to give him time served." *Negrón-Cruz I* at 102. A contested hearing was held, a time-served sentence was imposed, and the court re-imposed "the same supervised release conditions that were imposed following" Negrón's first revocation proceeding, "including Special Conditions 31 and 32." *Negrón-Cruz I* at 99.

Negrón was released November 10, 2023, and placed in "Guara Bi, … a transitional housing center … for homeless persons." A110.[2] A probation officer named José Lozada was placed in charge of supervising Mr. Negrón. A111.

Lozada made an unannounced visit to the homeless shelter on November 15, 2023. A110. From the start, the unannounced visit was tense. Lozada stood at the door prepared to have Negrón discharge a urine sample for him so probation could test for drug consumption. *See* A111. According to Lozada, Negrón "commenced to be a little bit defiant" when Lozada presented himself with the micturition-sampling paraphernalia. A198.

Negrón protested: "you [Lozada] don't know what you're doing…. [T]he judge eliminated the condition of drug test[ing]." A111.

Lozada then proceeded to search around Negrón's shelter room and observed a "hotspot." A112-A113. Lozada had Negrón step outside his room so Lozada could keep going through Negrón's things; Negrón then admitted to Lozada that he had a

---

[2] This Court recounts revocation-hearing facts "in the light most favorable to the government." *United States v. Frederickson*, 988 F.3d 76, 80 (1st Cir. 2021) (citation omitted). Factual and legal determinations made outside there—like here in ex parte co-adjudication contact with fact-witness Lozada—cannot be recounted because they were never disclosed.

smartphone in his laundry basket. A113, A116. The phone was an Android manufactured by BLU. A119. Lozada continued, finding a tablet Negrón had taken home from the Bureau of Prisons; it was also in the hamper. A117.

Lozada left to take the devices home (to Lozada's home) to "further inspect" the devices, A141, warning Negrón that he'd violated a condition "[a]bout not possessing a device that is capable to connect to the internet and possessing a cell phone or smartphone," A117. Lozada explained "the need for monitoring equipment" to Negrón. A120.

Lozada did not have Negrón's phone inspected by any forensic analyst or by anyone else at probation. A140-A141. Instead, after manually looking at the phone, Lozada purported to make an appointment to have probation's contractor "install the monitoring" system. A120; *also* A144.

As Lozada was searching Negrón's personal belongings, Lozada felt "Negrón was very defiant," later quoting Negrón as stating "that he's not in agreement with the conditions of supervision." A120. Negrón was going to have to pay the installation and monitoring fee even though he was not yet working. A144-A145.

Lozada didn't check back with Negrón again until the next month, December 2023, after someone tried to install the software on December 7. A111, A129, A146.

According to Lozada, though, the software install failed because BLU devices aren't compatible. A129; *see* also A145.

Negrón remained homeless after Lozada's failed installation attempt. Negrón also remained unemployed after the failed attempt.

At that point, Lozada believed his options to allow internet had been exhausted. Negrón's device was incompatible, and Lozada could not help him get a compatible device: probation lacks "funds to buy cell phones for persons under supervision." A145. Unlike in 2022 and 2023, when probation authorized a device without the software when Negrón was unemployed, Lozada did not relax the monitoring condition based on Negrón's specific circumstances.[3]

Unable to authorize internet and phone access, Lozada shifted focus, confronting Negrón for not being "employed at least 30 hours a week." A122. Negrón laughed at the prospect of seeking a job without having his own internet-capable device. A122. Lozada insisted he only needed to ask for permission to leave the shelter and "go out and secure employment or apply" in person. A122.

---

[3] Probation "suspended the monitoring-software requirement in February 2022, when Negrón was newly released from prison and homeless. At that time, Officer Mojica told him that he could use a smartphone without monitoring software 'until he could secure employment to cover the monitoring cost.'" *Negrón-Cruz I* at 108.

Lozada believed Negrón could have also used a homeless shelter computer while under supervision by staff. A122 ("And so several options as to employment were provided to him, including monitor [sic] by the Guara Bi Carib Center internet search for employment."). Lozada did not explain how potential employers would have contacted Negrón if he applied to a job without having phone or email access.

Unable to lawfully access the internet to handle essential life tasks, Negrón filed a motion to modify his supervised release conditions. Dated December 13, the motion was docketed on December 20. A44 (ECF No. 433); A194. It was denied. A44 (ECF No. 434); A194-A195.

Following the December 5 encounter with Lozada and the December 7 installation failure, Lozada did nothing further until he confronted Negrón a final time on January 3, 2024. At that time, 54 days had passed since Negrón's release. He had never been authorized to have or use his own internet-capable device. A124.

Lozada entered Negrón's shelter room and found various phones on the bed of Negrón's dwelling mate. A127. After first denying it, Negrón admitted one of the phones was his. A127. He'd recently obtained it through the federal government's

Lifeline program (*i.e.*, an "Obama phone").[4] *See* A127. Negrón gave Lozada the login code for his Lifeline phone and Lozada unlocked it. A127.

As Lozada was accessing Negrón's Lifeline phone, Negrón began gesticulating and getting close to Officer Lozada who perceived Negrón as "very agitated." A128. Lozada, impacted by Negrón's agitation, "terminated … the intervention based on security concerns." A127.

Lozada viewed the Lifeline phone as a violation since Officer Lozada never authorized Mr. Negrón to have a phone since his November 2023 release. A129.

### C. Electing not to follow Judicial Conference guidance to seek revocation, Probation sought Negrón's arrest and revocation in an unsworn narrative unbacked by an oath or affirmation.

Five days after his January 3 visit to Mr. Negrón, Officer Lozada filed a motion asking Judge Besosa to revoke Mr. Negrón's supervised-release term. A130; A83-A89. Lozada elected not to use the official form for alleging supervised release

---

[4] Lozada apparently lacked familiarity with the Lifeline program, a federal initiative that makes phone and internet services more accessible to low-income people. Due to Lifeline's expansion under the Obama administration, Lifeline phones are colloquially referred to as "Obama phones." Hence, Lozada provided this peculiar translation of his interaction with Negrón: "Negrón stated that the cell phone belonged to Former U.S. President Barack Obama, in which I asked him again about the ownership." A127.

violations (Form Prob 12C), which requires fact-witness officers to "declare under penalty of perjury." Prob 12C (revised May, 2021).

Instead, Lozada purported to be "notifying violations" in an unsworn capacity. A83. In addition to unpermitted phone use, Lozada would later claim, over *Morrissey*/Rule 32.1 objection, that Negrón also was not following homeless shelter rules because someone claimed he wasn't "doing the chores around" and was "leaving the center without telling the center where he was going." A132. As such, Lozada stated that someone at Guara Bi had said Negrón "was no longer going to be, be able to reside in the Guara Bi Carib Center." A134.

On January 10, 2024, federal agents arrested Negrón at the homeless shelter and revocation proceedings commenced. A45-A46 (ECF No. 446). Negrón remained in custody throughout those proceedings.

### D. Given the events now catalogued in *Negrón-Cruz*, Negrón sought to preclude ex parte contact with fact-witness Lozada.

Negrón moved in writing to preclude ex parte court contact with fact-witness Lozada. A90-A94. The government did not file a written response, but Lozada himself opposed the motion. A95-A97. Lozada did not address legal authorities that proscribe ex parte fact-witness communication. After reading Lozada's response, the district court denied it. AD1-AD2.

**E.** **Arguing the gravamen of revocation allegations related to unconstitutional conditions, Negrón sought dismissal of Lozada's unsworn motion.**

Having refused to restrain itself from ex parte conferencing and co-adjudication with Lozada (over objection), the district court had Lozada prepare a sentencing wording. A171.

The district court then had the government present its case on November 20, 2024: its only witness was Lozada. A107-A154. It also presented a portion of the preliminary hearing transcript in which Negrón testified. The government read from the portion it wished for the court to rely on. A159-A168.

The court granted a continuance for sentencing so that Lozada could ostensibly find Negrón temporary housing in the event that he receive a time-served sentence. A169-A170. At that time, Negrón had been detained for almost 11 months. A170. In light of the continuance, the court said the following to Lozada: "Lozada, what I would need from you, if you please, is a revised recommendation, in other words, what you guys call a 'wording.' Okay? All right. Based on—and you can base it on what, what you provided before and today's testimony. Okay?" A171.

During the continuance, Negrón renewed his objections to revocation on and enforcement of the special conditions restricting his internet access. A174-A179. Observing he otherwise substantially complied with supervised release, he argued

Lozada's unsworn motion seeking revocation should be dismissed. Negrón further renewed his objection to Lozada's participation in the adjudication of his own motion. This included express objection under the requirement that adjudication must be carried out by a neutral and detached arbiter. A177-A178. "The government alleged that it was seeking revocation based on allegations Officer Lozada made in his filings with the court and testimony during the preliminary hearing. But, while Officer Lozada's factual narratives and proposed conclusions were pending adjudication, th[e] [c]ourt met with Mr. Lozada about the alleged violations and sentencing recommendations." A178. Finally, Negrón's motion addressed sentencing should the court sustain any violation. Negrón argued he had already exceeded, in the aggregate, "the statutory maximum term of imprisonment." A178. In any event, in light of the constitutional issues, he asked the court not to "reimpose Special Conditions 31 or 32 for the reasons stressed." A179. The government opposed. To defend Lozada's ex parte co-adjudication, it cited cases discussing ex parte contact *at sentencing*. A181-A182. It had no authority permitting co-adjudication/consultation with fact-witnesses in contested hearings. It told the court, citing a case discussing Rule 32 proceedings, that fact-witness officers are "simply an extension of the court itself." A182.

**F. The revocation court defended its joint adjudication with fact-witness Lozada, and sentenced Negrón to an upward variance based in part on Lozada's conclusion that Negrón was defiant and the court's conclusion that Negrón's critiques of probation and the court meant he was further defiant.**

When the court reconvened, the parties argued their positions regarding sentencing and Negrón's counsel renewed his objections. A187-A194. Negrón also spoke to the court, referencing his motion to modify conditions, which he filed with Judge Besosa just after Lozada had set up the failed monitoring-software installation. A194.

Negrón noted also that he'd advised in a follow-up motion that Lozada had arranged the install without a forensic test, as probation alleged was necessary in his prior revocation proceedings. A195-A196. Negrón testified that "this makes very clear that a forensic test is not necessary in order for software to be installed on my phone. And the probation officer just offers excuses because they are incapable of installing software on my phone." A196.

Negrón then quoted his prior testimony from the preliminary hearing, recalling his answer on cross-examination as to whether he "need[s] the monitoring system for any device that is going to be under [his] possession." A197. He had answered: "As long as the probation officers can't solve … that problem, it's my understand that I can -- So far the probation officers have not been able to solve that

problem, and because of that, I have been left without a phone. If they cannot provide or they cannot solve the problem, I will be left without a phone for the rest of my life." A197.

Negrón then spoke out about probation's enforcement of the internet-monitoring condition:

> The incompetence of this Probation Office has left me out in the streets. And with all due respect, this has been the worst probation officer I've ever had. I lost my job. I lost my apartment. And I lost a chance to have relations with my younger daughter because of the inefficiency and the inabilities of the probation officer.

> I know about technology. I know what works and what doesn't work. And this software cannot—will not protect the public if anyone wants to do something crazy—correction—foolish at any time. The people that come here to be revoked are people with their cases, and I come here revoked because I have a cell phone.

> And in conclusion, they don't want to do a forensic test anymore, because they know I'm not the type of person—the last time on December 4 of 2013, I told the Court that this was all an investigation, and I wasn't believed. And what I have found in this [f]ederal system is just a horrible monster which has destroyed my life simply because I can't have a cell phone with internet. As if that would protect all of the public.

A197-A198.

The district court then announced various rulings, after complimenting the work of Lozada. It said the special conditions were not a complete internet ban. A200. Its basis for this did not arise from the evidence received but from a general

claim by the prosecution that this Court had called internet monitoring and filtering a "narrowly tailored tool." A200.

The court then sustained all violations alleged by Lozada, sentenced Negrón to 24 months' imprisonment, and reimposed all the same supervised-release conditions for a 268-month term. A201-A206. For the sentence, the district court disagreed with the defense's argument that prior violation terms had to be aggregated toward a total 24-month statutory maximum. A205. Instead, it held that 24 months was the statutory maximum anytime Negrón suffered a revocation. A203. While the guideline range was 3-to-9 months, the district court elected to vary upward based on the conclusion that Negrón "demonstrated an utter disregard for his supervision process, the duties of the Probation Office, and the conditions imposed by this Court." A203. According to the sentencing wording, Negrón "continues to be defiant, even during his allocution today, and noncompliant with his supervised release conditions." A203. The court recited the two times Negrón had a phone in his Guara Bi room, concluded he hadn't sought or found employment, and noted that Negrón had admitted to having devices without monitoring equipment. A204. Before citing some parts of 18 U.S.C. § 3553(a), the district court summed up its decision, saying Negrón's "attitude was completely negative and defiant towards the supervision officer, the supervision process, and the Court." A205.

### G. Negrón renewed his objections and appealed.

Counsel once again renewed his constitutional objections to special conditions 31 and 32, his objections regarding equal protection and delegation of judicial authority. A206-A207. He renewed his objection to the court's co-adjudication with and off-the-record ex parte contact with fact-witness Lozada, A207, and he objected under the First Amendment, A207 ("We object to the Court holding against Mr. Negrón-Cruz his First Amendment free speech, protected speech regarding his feelings about the Probation Department, about the Court, about the supervision process as that is his right to complain regarding those matters, so for the Court to hold that against him would violate his First Amendment rights as well."). Negrón timely appealed. A213.

## SUMMARY OF THE ARGUMENTS

In its August 2025 opinion, this Court definitively recognized that access to the internet is a fundamental constitutional right under the First Amendment. That panel opinion however held that Negrón's constitutional challenge—based on infringement of that right—was not yet ripe. This appeal presents an additional factual scenario in which Negrón was released for 62 days during which personal internet access was never authorized. Most notably, when Negrón's probation officer failed at having electronic monitoring software installed on Negrón's device, the officer felt he hit a dead end. Since Negrón could not afford a device on which internet-monitoring software could be installed, and probation couldn't simply purchase one for him, the only option probation had was to preclude personal internet access. Moreover, Negrón would not have faced such a ban if he could have purchased a compatible device; as such, the conditions, as applied, also violate equal protection.

The August opinion also addressed a recurring issue both in this case and the District of Puerto Rico: the ex parte participation of fact-witness probation staff in the adjudication of their own unsworn motions to revoke. That opinion ruled that the district court had committed non-reversible error by relying on new and significant information from a fact-witness probation officer. *Negrón-Cruz I* at 102-103. Yet, it blessed the general pre-adjudication meeting of fact-witnesses with district

courts so long as the fact witnesses work for probation. The underlying theory comes from a no-plain-error decision that addressed ex parte probation staff communication in original Rule 32 proceedings. That case is *United States v. Bramley*, 847 F.3d 1 (1st Cir. 2017). Accordingly, the panel held that the fact-witness officer's "participation in the revocation proceedings, standing alone, cannot be the basis for error." *Negrón-Cruz I* at 104. It faulted Negrón for "not cit[ing] to any precedent that supports the notion that her mere involvement in the proceedings, without any allegations of misconduct or legal error, would be problematic." *Negrón-Cruz I* at 104.

Respectfully, the *Negrón-Cruz I* panel did not give adequate weight to the Supreme Court's framework announced in *Morrissey v. Brewer*. Ex parte co-adjudication with a fact-witness offends the constitutional requirement that adjudication be carried out by a neutral and detached arbiter in a hearing allowing a certain degree of confrontation and assistance of counsel. Denial of core *Morrissey* rights should be treated as a structural error. This Court should hear this case en banc and overrule *Negrón-Cruz I*'s permissive treatment of ex parte co-adjudication.

Finally, this brief argues the sentence imposed must be reversed for two reasons. First, it improperly punished Negrón for statements protected under the First Amendment; namely, statements critical of U.S. Probation and the district

court. Second, since Negrón had already served an aggregate 24 months' imprisonment across prior violations, no further imprisonment should have been imposed.

**I.** **AS APPLIED, THE COURT'S INTERNET-ACCESS RESTRICTION CONDITIONS, IMPOSED AN IMPERMISSIBLE INTERNET BAN.**

"The First Amendment's free speech guarantee protects Negrón's right to access the internet." *United States v. Negrón-Cruz* (*Negrón-Cruz I*), 153 F.4th 90, 106 (1st Cir. 2025). That right was infringed here.

As noted in *Negrón-Cruz I*, the special conditions imposed in 2022 on their face allowed internet-enabled devices so long as they could be monitored and filtered for illegal content. *Negrón-Cruz I* at 97. Whatever the cost, Negrón had to "contribute to the cost of the monitoring service based on his ability to pay." *Id.*

In *Negrón-Cruz I*, this Court held that Negrón's as applied First Amendment challenge was not yet ripe. The record, opined the panel, did not reveal enough information about the time it takes to for Probation to finish tasks related to inspecting a device to be used by Mr. Negrón.

The record this time around shows a First Amendment-violating ban. From November 15, 2023, through January 3, 2024, Lozada never authorized Negrón to use or possess a phone. A129. And when Probation realized monitoring software was not compatible on December 7, 2023, that was the end of the road unless Negrón could purchase another device, which, undisputedly, he could not. The internet lim-

itations, as applied here effectively precluded Negrón "from meaningfully partici-pating in modern society." *United States v. Duke*, 788 F.3d 392, 400 (5th Cir. 2015). As he did not have "meaningful access to computers or the Internet." *United States v. Becerra*, 835 F. App'x 751, 756 (5th Cir. 2021) (citation omitted); *see also United States v. Clark*, 784 F. App'x 190, 193-94 (5th Cir. 2019) (finding unreasonable a condition requiring the defendant to request approval every time he sought to use a computer or access the internet).

A smartphone is "indispensable to participation in modern society." *Carpenter v. United States*, 585 U.S. 296, 315 (2018) (quoting *Riley v. California*, 573 U.S. 373, 385 (2014)); *see United States v. Peterson*, 248 F.3d 79, 83 (2d Cir. 2001) (same for computers). And as the Supreme Court observes, "the loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976) (citation omitted). Such an injury was occasioned here such that the court's revocation determination, based on en-forcement of Special Conditions 31-32, was erroneous.

## II. AS APPLIED, THE COURT'S INTERNET-ACCESS RESTRICTION CONDITIONS VIOLATED EQUAL PROTECTION.

Unlike in *Negrón-Cruz I*, where a lack of factual development left the issue unripe, the record here shows that Lozada's enforcement of the conditions blocked Negrón's internet access based on his indigency. In Lozada's words, once Negrón's

device was incompatible, Probation can do nothing else unless Negrón could buy a compatible phone since it lacks "funds to buy cell phones for persons under supervision." A145. The condition here should not have been enforced under the Fifth Amendment's equal protection guarantee *See Bolling v. Sharpe*, 347 U.S. 497, 498-99 (1954). Special Condition 31 deprived Negrón of his First and Fifth Amendment rights based on his non-willful inability to pay the third-party internet-access fee arranged by probation. *See Bearden*, 461 U.S. at 668-69, 672; *Williams v. Illinois*, 399 U.S. 235, 240-41 (1970) (vacating judgment because when imprisonment exceeds maximum period fixed by statute and "results directly from an involuntary nonpayment of a fine or court costs we are confronted with an impermissible discrimination that rests on ability to pay"); *Tate v. Short*, 401 U.S. 395, 398 (1971) ("[T]he Constitution prohibits the State from imposing a fine as a sentence and then automatically converting it into a jail term solely because the defendant is indigent and cannot forthwith pay the fine in full." (internal quotation marks omitted)).

The central mandate of the equal protection guarantee is that "[t]he sovereign may not draw distinctions between individuals based solely on differences that are irrelevant to a legitimate governmental objective." *Lehr v. Roberson*, 463 U.S. 248, 265 (1983). Along with equal protection, due process prohibits "invidious discrimination between persons and different groups of persons." *Griffin v. Illinois*, 351 U.S.

12, 17 (1956); *see id.* at 20 (holding that failure to provide indigent defendants with trial transcripts at no cost violated equal protection and due process). In short, "[b]oth equal protection and due process emphasize the central aim of our entire judicial system—all people charged with crime must, so far as the law is concerned, stand on an equality before the bar of justice in every American court." *Id.* at 17 (citation, internal quotation marks omitted). The special conditions, as enforced and applied, violates equal protection and due process.

III.   **THE COURT'S CO-ADJUDICATION WITH FACT-WITNESS LOZADA BEFORE THE START OF THE CONTESTED HEARING AND DURING A CONTINUANCE VIOLATES *MORRISSEY*.**

Throughout the revocation matter, Negrón asked the Court not to engage in ex parte communication with fact-witness José Lozada. In addition to being per se excluded from a process that must be held by a neutral and detached arbiter, Lozada was particularly ill-suited for an ex parte role in the court's adjudication. Lozada had a strained past with Negrón when he was released in winter 2023. Lozada's quotation of Negrón's statements to him evidenced his taking personal offense to Negrón's attitude to Lozada's actions.

As argued below, Lozada, the government's fact witness, should not have met ex parte with the court as part of its adjudicative process. A90-A94; A102. Yet, Lozada and the court insisted they needed to meet regarding the adjudication. 95-97;

A102. Lozada, before the contested hearing informed the defense he "had ex-parte communications with the Court and that he ha[d] discussed the allegations with the Court, ha[d] provided a recommendation to the Court regarding a possible sentencing outcome and may have discussed facts related to the allegations of the violations contained in … [his] various motions." A102-A103.

The government defended the co-adjudication based on cases derived from Rule 32 proceedings (where probation drafts a PSR and has a defined consultation role) and based on practice. A182-A183; A103-A104 ("It is not uncommon that in these types of proceedings the probation officer be a witness as to the violations that they are reporting.").

The district court further revealed Lozada's co-adjudication role just before the continuance from the hearing in which Lozada testified. "Lozada, what I would need from you,"—ahead of the next hearing—"if you please, is a revised recommendation, in other words, what you guys call a 'wording.' Okay? All right. Based on—and you can base it on what, what you provided before and today's testimony. Okay?" A171.

Lozada's enforcement judgment and credibility were at issue. Lozada was evidently offended by how Negrón spoke to him. Lozada faced Negrón's disagreement

with conditions blocking him from personal access to the internet. And Lozada evidently felt offended by Negrón's disagreement about whether a man in the year 2023 can find and obtain a job without personal access to an internet-enabled phone. Whether Lozada's factual views were correct and reasonable matter in determining both whether a violation occurred and how it ought to be punished.

When the district court sentenced, it expressly linked the severity of its punishment to Lozada's subjective feeling about Negrón's attitude. Negrón's giving of confidential advice as a member of the adjudicative team violated the constitutional demand for "a neutral and detached arbiter." *See Morrissey v. Brewer*, 408 U.S. 471, 489 (1972). "[U]nder a realistic appraisal of psychological tendencies and human weakness, conferring investigative and adjudicative powers on the same individuals poses such a risk of actual bias or prejudgment that the practice must be forbidden if the guarantee of due process is to be adequately implemented." *Withrow v. Larkin*, 421 U.S. 35, 47 (1975).

After *Morrissey*, the neutral-and-detached-arbiter requirement is protected under 18 U.S.C. § 3583(e)(3), which permits revocation of supervised release only "if *the court*, pursuant to the Federal Rules of Criminal Procedure applicable to revocation of probation or supervised release, finds by a preponderance of the evidence that the defendant violated a condition of supervised release." 18 U.S.C.

§ 3583(e)(3) (emphasis added). In turn, Rule 32.1 structures revocation hearings, providing the accused with the right to public hearing, incorporating minimum due process standards. *See* Fed R. Crim. P. 32.1(b)(2). And since 1979, Rule 32.1 expressly incorporates minimum due process standards:

- Notes of Advisory Committee on Rules—1979: "Since *Morrissey v. Brewer*, 408 U.S. 471 (1972), and *Gagnon v. Scarpelli*, 411 U.S. 778 (1973), it is clear that a [supervised person] can no longer be denied due process in reliance on the dictum in *Escoe v. Zerbst*, 295 U.S. 490, 492 (1935), that [community supervision] is an "act of grace."

- Notes of Advisory Committee on Rules—1993 Amendment: "Requiring production of witness statements at hearings conducted under Rule 32.1 will enhance the procedural due process which the rule now provides and which the Supreme Court required in *Morrissey v. Brewer*, 408 U.S. 471 (1972) and *Gagnon v. Scarpelli*, 411 U.S. 778 (1973)."

- Committee Notes on Rules—2002 Amendment: "Rule 32.1(b)(1)(B)(iii) and Rule 32.1(b)(2)(C) address the ability of a releasee to question adverse witnesses at the preliminary and revocation hearings. Those provisions recognize that the court should apply a balancing test at the hearing itself when considering the releasee's asserted right to cross-examine adverse

witnesses. The court is to balance the person's interest in the constitution-ally guaranteed right to confrontation against the government's good cause for denying it. *See, e.g., Morrissey v. Brewer*, 408 U.S. 471, 489 (1972); *United States v. Comito*, 177 F.3d 1166 (9th Cir. 1999); *United States v. Walker*, 117 F.3d 417 (9th Cir. 1997); *United States v. Zentgraf*, 20 F.3d 906 (8th Cir. 1994)."

Unlike in revocation proceedings, original sentencing proceedings allow courts, upon case-specific reasons or local rule, to receive ex parte sentence recommendations from probation's presentence report writers *after* a person has pleaded guilty. Fed. R. Crim. P. 32(e)(3). As Rule 32(e)(3) provides, "[b]y local rule or by order in a case, the court may direct the probation officer not to disclose to anyone other than the court the officer's recommendation on the sentence." But the presentence report, or any ex parte recommendation, cannot be disclosed to an adjudicator "until the defendant has pleaded guilty or nolo contendere, or has been found guilty." Fed. R. Crim. P. 32(e)(1).

The express probation officer role in Rule 32, and the absence of any special role in Rule 32.1 must be understood as intentional under the *expressio unius* canon, which states that "the expression of one thing is the exclusion of other things." *United States v. Reccko*, 151 F.3d 29, 34 (1st Cir. 1998). With Rule 32.1's incorporation

of *Morrissey* and *Gagnon*, that rule elects not to distinguish between witnesses, whether they be impartial, civilian fact witnesses or fact witnesses who seek arrest, warrants, and revocation on behalf of U.S. Probation. The drafters of Rule 32.1 and lawmakers passing 18 U.S.C. § 3583(e)(3) were aware that federal revocation cases would be prosecuted by U.S. Attorneys with the use of probation officers as fact witnesses in a distinct role from the Rule 32 process; and they knew from *Morrissey*, *Gagnon*, and *Withrow v. Larkin*, that investigative and adjudicative functions needed to be separate to ensure fairness and due process. *See Parker Drilling Mgmt. Servs., v. Newton*, 587 U.S. 601, 611 (2019) ("Congress legislates against the backdrop of existing law.") (citation, internal quotation marks omitted).

To be sure, this Court has addressed limited, non-structural claims regarding ex parte pre-revocation sentencing contact with fact-witness officers. *See United States v. Reyes-Correa*, 81 F.4th 1, 6 (1st Cir. 2023). But, as addressed in the next section, the error here is of structural dimension. The judgment of conviction does not authorize revocation by an arbiter who is not neutral and detached. As one state tribunal explained the *Morrissey/Gagnon* right, "[i]t is fundamental to the concept of a fair hearing that a judge not receive information relevant to the disposition of a case outside the adjudicatory process and outside the presence of one or both parties."

*State v. Stewart*, No. W2009-00980-CCA-R3-CD, 2010 Tenn. Crim. App. LEXIS 691, at *21 (Crim. App. Aug. 18, 2010).

Here, the district court admitted it was treating fact-witness Lozada as member of the court's adjudicative unit when Negrón "reassert[ed] [his] objection based upon the Court's co-adjudication of the revocation proceeding with Probation Officer Lozada and the off-the-record ex parte discussions the Court had with a necessary fact witness in these revocation proceedings." A207. He assumed Lozada played a "fundamentally different" role than "third parties," calling fact-witness Lozada "an extension of the court itself." A209. This called back the district court's early admission on how it used Lozada to recommend sustaining and punishing violations: "You have to remember that the U.S. Probation Officer [is] the eyes and ears of the Court." A103.

If the decision to revoke is not made by neutral and detached arbiter, it's like a jury verdict delivered without a jury, and therefore should be held to be structural error.

While Rule 32 does let PSR writers be the eyes and ears of the court, supervising officers must be kept outside the adjudicative unit. Otherwise, the accusation of violations would not require officers to "declare under penalty of perjury that" any allegations are "true and correct.'" *United States v. Collazo-*

*Castro*, 660 F.3d 516, 523 n.4 (1st Cir. 2011) (quoting Form PROB-12C). Lozada's role in seeking revocation based on his own percipient observations, interventions, and interpretation render him an improper participant in the co-adjudication of violations and the fashioning of punishment.

Moreover, Lozada's recollection and interpretation of events were challenged and disputed. At the time of the final hearing, significant disputes remained over what communication transpired between Appellant and probation officers, including the demeanor of Negrón, which Lozada characterized as defiant, a characterization the court adopted and repeated.

Finally, if there were ever a time when probation personnel staff were seen as more inherently credible than third parties, it has passed. In September 2021, Enoch Eller Jr., a former officer for the Southern District of Georgia admitted he lied about performing his supervisory duties, entering a guilty plea to one felony count of false statements. *See United States v. Enoch Eller, Jr.*, 21-cr-70-DHB-CLR, ECF No. 14 (plea agreement) (S.D. Ga. Sept. 22, 2021). From the looks of Eller's case, it was not the case of someone bribed to make false statements or drive by addiction or the like. He was a career government servant who spent a 13-year period telling his supervisors and judges "that he performed drug testing and conducted home visits for certain individuals under his supervision when he had not done so." Dep't of

Justice, Press Release: Former Federal Probation Officer Pleads Guilty to False Statements Regarding Performance of Supervisory Duties, Sept. 21, 2021, https://justice.gov/usao-sdga/pr/former-federal-probation-officer-pleads-guilty-false-statements-regarding-performance.

Similarly, another former officer Dennis Edward Bresnahan showed the peril in assuming the vocation of probation officer renders a person beyond partiality. *See* Plea Agreement, *United States v. Dennis Edward Bresnahan*, 18-cr-195-RWP-HCA, ECF No. 56 (D. Minn. Mar. 1, 2019). When Bresnahan was investigated by FBI special agents regarding inappropriate conduct with people he supervised, he made criminal false statements that were punished with 30 months' imprisonment and two years' supervised release. *Id.*, ECF No. 93 at 20-21 (court's sentencing opinion and order). While Eller may have been driven to fudge his reports because he felt over-worked and Bresnahan lied to prevent federal "officers from discovering that he had physically and emotionally harmed many more women," *id.* at 16, the net result for this Court's analysis is that the thousands of people working as federal probation officers are all subject to the basic human weaknesses we all are. When they meet in chambers with a judge *before* an adjudicative hearing to agree that violations took place and agree as to punishment, as occurred here, the neutral-and-detached-arbiter requirement for due process is left unmet. *See Morrissey*, 408 U.S. at 489. In

revocation matters, probation personnel cannot be the "eyes and ears" of a court that also takes under oath testimony from them as fact witnesses.

While the Rule 32.1 process allows the probation officer no role in the adjudicative process, the subject allegations are consistent with circumstances that would have disqualified the officer being a part of a neutral adjudicative process. In *In re Murchison*, 349 U.S. 133, 138 (1955), the question was whether a criminal contempt proceeding "where the same judge presiding at the contempt hearing had also served as the 'one-man grand jury' out of which the contempt charges arose" complied with due process. 349 U.S. at 134. The Supreme Court held that it did not. Lozada filed his unsworn narrative recommended revocation after a highly emotional set of allegations that included interactions in which he felt Negrón was "defiant" toward him. "[E]very procedure which would offer a possible temptation to the average man as a judge … not to hold the balance nice, clear and true between the State and the accused, denies the latter due process of law." *Tumey* v. *Ohio*, 273 U.S. 510, 532 (1927).

While Lozada may harbor no actual bias and may be equipped to weigh the scales of justice fairly, the adjudicators of supervision violations must perform their high function in a manner that upholds not only the substance but the appearance of justice. *See Offutt v. United States*, 348 U.S. 11, 14 (1954) ("[J]ustice must satisfy the

appearance of justice."). Which is why, simply put, *Morrissey* held that, "when review of an initial decision is mandated, the decisionmaker must be other than the one who made the decision under review." 408 U.S. at 485. Lozada initially recommended revocation of Negrón's supervised release, so he cannot also serve as member of the confidential adjudication unit to evaluate whether to revoke and what sentence to impose.

This error should be considered structural because it left the district court and Lozada unable to serve as a vehicle for reliably determining guilt or innocence. *See Arizona v. Fulminante*, 499 U.S. 279, 310 (1991). When the district court secured supervised-release jurisdiction through Appellant's 2015 guilty plea, sentencing, and judgment, due process protections flowed to any administrative proceedings related to supervised release-conditions compliance. Structural errors are generally conceived of as events in a trial, "defect[s] affecting the framework within which the trial proceeds, rather than simply an error in the trial process itself." *Id.* at 310. "Unlike a garden-variety trial error, a structural error 'transcends the criminal process,' … by depriving a defendant of those 'basic protections [without which] a criminal trial cannot reliably serve its function as a vehicle for determination of guilt or innocence, and no criminal punishment may be regarded as fundamentally fair.'" *United States v. Padilla*, 415 F.3d 211, 219 (1st Cir. 2005) (en banc) (first quotation

from 499 U.S. at 311; second from *Rose v. Clark*, 478 U.S. 570, 577-78 (1986) (citation omitted)).

Concededly, a post-trial revocation proceeding falls outside the trial process. Nevertheless, the denial of a neutral and detached arbiter due to officer-district court adjudicative unit is akin to the structural error given the specter of a biased adjudicator, which is a structural error. *See Tumey*, 273 U.S. at 517. As such, reversal is warranted.

To the extent that *Negrón-Cruz I* bars granting relief here, that opinion should be reconsidered en banc and overruled.

## IV. THE 24-MONTH SENTENCE IMPOSED ON NEGRÓN IS UNLAWFUL AS IT EXCEEDS THE APPLICABLE STATUTORY MAXIMUM.

### A. The maximum-revocation-sentence statute must be read to impose an aggregate maximum reimprisonment term.

Under § 3583(e), courts are authorized to revoke supervised release and reimprison people under supervision provided the government proves a violation of supervised release conditions by a preponderance of the evidence. 18 U.S.C. § 3583(e)(3). But § 3583(e)(3) "caps the stiffest possible sentences," *United States v. Tanco-Pizarro*, 892 F.3d 472, 475 (1st Cir. 2018), based on the severity of "the

offense that resulted in the term of supervised release." § 3583(e)(3).[5] For Class C

felonies, like Negrón's, the maximum sentence is two years. § 3583(e)(3). For Class

A and B felonies, the maximum sentences are higher. § 3583(e)(3).

Prior to a 2003 amendment to § 3583(e)(3), the circuit courts largely agreed

that—when calculating the maximum term of reimprisonment upon revocation—

district courts were required to subtract the aggregate of all terms of revocation

reimprisonment from the statutory maximum. *See United States v. Tapia-Escalera*,

356 F.3d 181, 187 & n.7 (1st Cir. 2004). This interpretation was based largely on the

---

[5] The entirety of 18 U.S.C. § 3583(e)(3) provides:

> The court may, after considering the [§ 3553(a) factors] … (3) revoke a term of supervised release, and require the defendant to serve in prison all or part of the term of supervised release authorized by statute for the offense that resulted in such term of supervised release without credit for time previously served on postrelease supervision, if the court, pursuant to the Federal Rules of Criminal Procedure applicable to revocation of probation or supervised release, finds by a preponderance of the evidence that the defendant violated a condition of supervised release, except that a defendant whose term is revoked under this paragraph may not be required to serve on any such revocation more than 5 years in prison if the offense that resulted in the term of supervised release is a Class A felony, more than 3 years in prison if such offense is a Class B felony, more than 2 years in prison if such offense is a Class C or D felony, or more than one year in any other case.

§ 3583(e)(3).

legislative history of a 1994 amendment to the statute. *See* Violent Crime Control and Law Enforcement Act of 1994, Pub. L. No. 103-322, 108 Stat. 1796 (1994).

In 2003, however, § 3583(e)(3) underwent a change with the PROTECT Act's addition of the phrase "on any such revocation," which Congress inexplicably added after language defining the maximum terms of revocation sentences. Pub. L. 108-21, § 101, 117 Stat. 650, 651.

In the intervening years, many courts have interpreted the phrase "on any such revocation" to mean that Congress quietly amended § 3583(e)(3)'s aggregate cap, which existed before and after the 1994 amendment. *See, e.g.*, *United States v. Cunningham*, 800 F.3d 1290, 1292 (11th Cir. 2015). *Cunningham* is typical of cases that see these four words—"on any such revocation"—as permitting serial revocation and reimprisonment with a constantly resetting statutory maximum reimprisonment term. *See United States v. Spencer*, 720 F.3d 363 (D.C. Cir. 2013); *United States v. Williams*, 675 F.3d 275 (3d Cir. 2012); *United States v. Hunt*, 673 F.3d 1289 (10th Cir. 2012); *United States v. Hampton*, 633 F.3d 334 (5th Cir. 2011).

Respectfully, these cases did not fully appreciate the meaning of the amended language in context and inadequately applied relevant canons of statutory interpretation. "That these decisions have snowballed down one path doesn't mean [this Court] should follow them …." *Shea v. United States*, 976 F.3d 63, 69 (1st Cir. 2020)

(citation omitted). Instead, this Court should reaffirm the existence of an aggregate reimprisonment cap.

### 1. A plain reading of § 3583(e)(3) still supports aggregating multiple violations.

While many appellate courts have held that § 3583(e)(3)'s statutory maximum resets each time supervision is revoked, the pre-2003 reading is not precluded by the PROTECT Act's amended language and should not be abandoned. The text of § 3583(e)(3) still suggests that district courts are required to subtract the aggregate length of prior imprisonment terms imposed upon revocation of supervised release when calculating the statutory maximum for subsequent revocations.

As discussed above, the word "any" can be plainly read to mean "all," such that "less any term of imprisonment" means less "all" terms of imprisonment. *See Rodríguez*, 775 F.3d at 537. In that respect, the one additional word "such" must not be understood to suddenly permit a relentless resetting of the statutory maximum on multiple violations.

Moreover, the entirety of § 3583(e)(3)—which expresses maximum limits based on the class of the subject offense *and* the available term of supervised release—does not support reading "any such revocation" as an individual revocation event.

Getting to the first limit, the text of § 3583(e)(3) lets courts "revoke a term of supervised release[ ] and require the defendant to serve in prison *all or part of the term of supervised release authorized by statute* for the offense that resulted in such term of supervised release…" § 3583(e)(3) (emphasis added). This language plainly limits a court's reimprisonment authority to available supervised release time.

The statute goes on to clarify that courts need not provide "credit for time previously served on post-release supervision, if the court," under applicable rules, "finds by a preponderance of the evidence that the defendant violated a condition of supervised release…" § 3583(e)(3).

This first statutory maximum is tempered by a second, stating revocation sentences carry the "except[ion] that a defendant whose term is revoked under this paragraph may not be required to serve on any such revocation more than" the term of years specified by the class of the subject felony. § 3583(e)(3) (*i.e.*, Class A: five years; Class B: three years; Class C or D: two years; any other case: one year).

When viewing this provision in conjunction with § 3583(b) (setting maximum supervision terms) and § 3583(h) (limiting supervision terms after revocation), it is evident that § 3583 as a whole fixes an aggregate limit upon total reimprisonment that courts may impose under successive revocation sentences.

The additional adverbial phrase "on any such revocation" does not in any way link to this language from the start of § 3583(h), and the entirety of § 3583 cannot naturally be read as resetting subsection (e)(3)'s based on an individual event revoking supervision.

Finally, other uses of the word "revocation" support a reading that "revocation" is used as a bulk noun, not a single discrete revoking event. The "-ion" suffix is used throughout § 3583(e) not to discuss discrete events but to discuss the process or result of supervised-release revocation. Hence, the title of § 3583(e) is "Modification of Conditions or Revocation." The word "revocation" then appears twice in § 3583(e)(3). The first is to specify that a court may "revoke" a supervision term only if its findings are "pursuant to the Federal Rules of Criminal Procedure applicable to revocation of probation or supervised release …." § 3583(e)(3).

This use of revocation was surely not—without further Congressional direction—referring to a specific event but rather the process through which a court may revoke. Tellingly, Congress could have said that maximum penalties apply each time supervision is "revoked." Instead, however, Congress mentions "revocation" as a non-specific mass noun.

This Court "accord[s] the statutory text its ordinary meaning by reference to the specific context in which that language is used, and the broader context of the

statute as a whole." *United States v. De La Cruz*, 998 F.3d 508, 513 (1st Cir. 2021), cert. denied sub nom. *Cruz v. United States*, 142 S. Ct. 633 (2021) (citations and internal quotation marks omitted). Since the textual and structural clues in § 3583(e) enable the Court to conclude the aggregate reimprisonment cap remains intact, the Court need "not defer to some conflicting reading" to resolve it. *Id.* (citations and internal quotation marks omitted).

Against this background, we see that cases finding abolishment of the aggregate cap share a common conclusory analysis. For example, in *United States v. Shabazz*, 633 F.3d 342 (5th Cir. 2011), the court recognized that "any" meant "all" in § 3583(h), but concluded that "inclusion of the word 'such' after 'any' demonstrates that the language at the end of § 3583(e)(3) refers to an individual revocation." *Id.* at 345. That court, to our understanding, did not contend with the argument that "revocation" appears throughout § 3583 as a mass noun, not as a noun describing "individual" events *as Shabazz and other courts assumed.*

Thus, the purported plain reading of cap abolition in § 3583(e)(3) is discordant with the presumption that Congress "uses a particular word with a consistent meaning in a given context." *Erlenbaugh v. United States*, 409 U.S. 239, 243-44 (1972). And yet, the circuits following the *Shabazz* decision mirror the same short treatment of the "any such revocation" language. In *Hernández*, for instance, the Tenth Circuit

made the remarkable leap to interpret "on any such revocation" to "upend[ ] existing case law and bring[ ] … an end [to] aggregation" simply because the language "was … presumably designed to do *something*." *Hernández*, 655 F.3d at 1196. To reach its conclusion, the *Hernández* court hypothesized that the 2003 Congress "was presumably aware of judicial decisions allowing aggregation when it adopted its 2003 amendment," and so meant to abolish aggregation. *Id.*

But the *Hernández* hypothesis veers beyond the statutory text and does not adequately analyze the plain language within § 3583(e)(3). Despite the 2003 amendment, Congress continued to use "revocation" as a bulk, conceptual noun, rather than as an individual act. Yet, at the start of § 3583(e)(3), Congress separately refers to "revoking," saying the court may "*revoke* a term of supervised release." § 3583(e)(3) (emphasis added). And as described below, such implicit repeal is highly disfavored.

Thus, the plain meaning of § 3583(e)(3) does not call for abolishment of the aggregate cap in effect for at least the previous decade. And as we argue below, if the "any such revocation" language is unclear, further interpretation does not support wholesale abolition of the cap on reimprisonment.

## 2. Even if the text of § 3583(e)(3) is ambiguous, legislative and due process concerns favor aggregation of prior terms to calculate new allowable sentences.

The imposition of an aggregate cap on revocation terms finds support in both interpretative tools and normative reasons.

### a. The 2003 amendment did not transcend existing legislative intent to impose an aggregate cap on revocation-based reimprisonment.

This Court noted that the "1991 Senate Report discussing virtually the same language adopted in 1994 makes clear that the cap is to apply to the aggregate term of all imprisonments for release condition violations." *Tapia-Escalera*, 356 F.3d 187 (footnote omitted). The Report states that

> in the case of a Class C felony for which the maximum supervised release term is three years, a defendant who is revoked and reimprisoned for 18 months could be ordered to serve as much as 18 additional months on supervised release (36-month maximum term of supervised release-18 months imprisonment = 18 months possible re-release supervision). *If the same defendant was again revoked, he could be reimprisoned for not exceeding six months (24-month cap-18 months previously-served imprisonment = 6 months allowable imprisonment) and if so imprisoned, could not thereafter be placed on supervision (because the two-year imprisonment cap would have been reached).* Thus, under [the amendments], a defendant would always be credited for incarceration time against both the cap on reimprisonment and the maximum authorized period of supervised release.

137 Cong. Rec. S7772 (daily ed. June 13, 1991) (emphasis added). It was only in dicta that the *Tapia-Escalera* court took the position that the PROTECT Act removed any aggregate cap on multiple sentences following revocation.

As *Tapia-Escalera* observed, the 1991 Senate Report was "no chance remark in a hearing or on the floor but [was] a full-scale explanation of the bill in detail, and it is clarity itself on the point at issue." *Tapia-Escalera*, 356 F.3d at 187. While the 2003 addition of the words "on any such revocation" may appear significant, the existence of the interpretation of a cap is highly supported by statutory analysis.

### b. Reading away an aggregate reimprisonment term would render prominent statutory language superfluous and would ignore the structure of § 3583.

Under the rule against superfluousness, a "statute should be construed so that effect is given to all its provisions, so that no part will be inoperative or superfluous, void or insignificant." *Corley v. United States*, 556 U.S. 303, 314 (2009) (internal quotation marks and citation omitted). As mentioned, § 3583(e)(3) has dual limitations on reincarceration terms: one based on "the term of supervised release authorized by statute"; a second based on the class of the offense of conviction. § 3583(e)(3).

To simply allow the period of reincarceration to reset *ad infinitum* is not consistent with the language of the statute and such an interpretation would erode the meaning of both the clause limiting incarceration to permissible supervised-release

terms and the clause limiting reincarceration to express class-of-the-offense-based limitations. The integration of these clauses requires an aggregate term.

Moreover, § 3583's use of finite terms of years would be rendered superfluous were § 3583(e)(3) to allow unlimited resetting on multiple reincarceration terms. In all, the anti-superfluousness canon supports a view that § 3583(e)(3) still imposes an aggregate cap on reincarceration.

Congress could have clearly stated that each revocation carries a separate re-imprisonment term, and its lack of direct action shows it did not intend to do so. *See De la Cruz*, 998 F.3d at 516 ("It would have been far easier for Congress simply to include MDLEA offenses under" the relevant statutes "if it intended for the safety valve to apply to such offenses, rather than rely on a complex analysis …. We cannot conclude that Congress intended to do indirectly what it could have done directly but did not.") (citations omitted).

### c. Policy reasons support an aggregate cap on supervised release-based reimprisonment.

The Second Circuit has noted that a "per-revocation" limit in § 3583(e)(3) essentially allows an "endless cycle of consecutive terms of imprisonment and sup-ervised release based on a single underlying offense...." *United States v. Epstein*, 620 F.3d 76, 81 (2d Cir. 2010) (citation and internal quotation marks omitted). When the Second Circuit joined other circuits interpreting a pre-2003 reimprisonment cap, it

thus noted that "Congress gave no indication whatsoever of intending" such an endless cycle. *United States v. Merced*, 263 F.3d 34, 37 (2d Cir. 2001).

And this Court notably referred to Congress's intent underlying § 3583(e)(3) as tied to an "unusually explicit legislative history." *Tapia-Escalera*, 356 F.3d at 187. This Court also saw no love lost in understanding § 3583(e)(3) to limit the total time a person can be reincarcerated for a supervised release infraction.

The government may nevertheless respond that if prior terms had to be aggregated, then when the cap was served defendants could violate minor conditions with impunity. *Tapia-Escalera*, 356 F.3d at 186.

But this Court already answered that question: a "three-year cap even in the aggregate would normally suffice to punish even a succession of petty supervised release violations." *Id.* at 188. And more serious violations "can be independently prosecuted in a criminal case." *Id.*

Moreover, such conjecture does not harmonize with any expression by Congress, a body which cannot be assumed to prefer a virtually never-ending possibility of reimprisonment over other tools of reentry support provided by probation officers—especially given the explicit legislative history that caused courts to accept § 3583(e)(3)'s pre-2003 reimprisonment cap as being "reduced by revocation terms already served." *Id.* at 187.

### d. The presumption against implied repeal supports an aggregate reimprisonment cap.

Nor does the 2003 PROTECT Act contain any commensurate record suggesting it sought to overrule the broadly understood interpretation of § 3583(e)(3) as having an aggregate cap. PROTECT Act, § 101, 117 Stat. AT 651-652. The Act's entire handling of supervised-release provision amendments spans less than a page.

The legislative record for the 2003 bill contains no reference to abolishing § 3583(e)(3)'s aggregate cap. Senator Orrin Hatch, who introduced the Act, presented a detailed report with nine separate subsections. S. Rep. No. 108-2, 2003 WL 330688, at 1-51 (Feb. 11, 2003). Only an attachment to the report mentions supervised release. There, a letter from the National Center for Missing and Exploited Children expresses support for "extending the *terms of authorized supervised release* in federal cases involving the exploitation of minors," adding that "evidence for extended supervision in such cases is overwhelming. Without adequate treatment and continued supervision, there is a significantly higher risk for re-offending by this type of offender." *Id.* at 29 (emphasis added). Importantly, this record did not contemplate needed to expand the aggregate statutory maximum to one that would effectively allow life imprisonment through resetting.

A final report from the House of Representatives discusses the amendments to § 3583, making sole mention to post-release supervision terms with no discussion

on repeal of the aggregate cap: "This section amends 18 U.S.C. [§] 3583 to provide a judge with the discretion to extend the term of post-release supervision of sex offenders up to a maximum of life." H.R. Conf. Rep. 108-66, 2003 WL 1862082, at 49 (April 9, 2003). The genesis to Section 1 of the PROTECT Act came from the "Lifetime Consequences for Sex Offenders Act of 2002." See 148 Cong. Rec. H3871-01, 2002 WL 1368895 (2002). Yet, in that legislation, the text adding "on any such revocation" was absent. As such, the passage of the PROTECT Act proceeded without a single written word about abolishing the existing aggregate cap.

Nor did Congress's cost estimates reflect an intention to multiply possible punishments for each and every conviction following the PROTECT Act. An official Congressional Budget Office ("CBO") cost estimate for the Act listed expenses related to new and existing child pornography offenses. CBO, Cost Estimate:  S. 151 Prosecutorial Remedies and Tools Against the Exploitation of Children Today Act of 2003 (Feb. 19, 2003), https://www.cbo.gov/sites/default/files/108th-congress-2003-2004/costestimate/s15110.pdf. The Act's anticipated costs were to "establish new federal crimes and expand authorities under existing crimes against child pornography. It also would give law enforcement agents additional powers to investigate offenders." *Id.* The budget report included no costs whatsoever related to the re-setting the maximum term of reimprisonment for everyone released on supervision

after 2003. And the budget report listed no cost to be incurred by U.S. Probation for the possible lengthening of many supervision terms.

Finally, the budget report listed a fiscal impact from imprisonment at less than $500,000 per year going forward. *Id.* at 1. Even in 2003, that amount would only have paid for twenty-five new prisoners. *See* BOP, Notice, 68 Fed. Reg. 19228 (April 18, 2003) (listing 2002 average cost of incarceration as $22,517). The budget did not contemplate repeal.

In sum, an implied repeal must not be assumed. Congress had good reason for not, in the PROTECT Act, repealing the aggregate cap in § 3583(e)(3); it applies to all supervised-release terms, not just those targeted by the PROTECT Act's addition of 18 U.S.C. § 3583(k). *Cf. De la Cruz*, 998 F.3d at 513 ("Congress had a good reason for not including MDLEA offenses among those eligible for safety valve relief: at that time, Congress was especially concerned about drug trafficking over the seas ...."). Congress illustrated no intent to repeal the subject cap, so no such intent should be assumed, especially when Congress's 1994 intent was so clear, and its 2003 legislative intent was expressly focused on the lengthening of supervision terms for but a narrow class of defendants.

### 3.    The rule of lenity compels the conclusion that an aggregate cap remains.

As this Court noted in *Tapia-Escalera*, to "the extent that we are left with any uncertainty after these considerations, the rule of lenity applies to tip the balance in the defendant's favor." 356 F.3d at 188 (citing *United States v. Luna-Díaz*, 222 F.3d 1, 3 n. 2 (1st Cir. 2000)). Lenity prohibits increasing or multiplying "punishments absent a clear and definite legislative directive." *Simpson v. United States*, 435 U.S. 6, 15-16 (1978), *superseded by statute as recognized in United States v. Jones*, 471 F.3d 478, 483 (3d Cir. 2006); *see Bifulco v. United States,* 447 U.S. 381, 387-400 (1980) (applying rule to hold that former 21 U.S.C. § 846 prohibited term of special parole for defendants convicted of conspiring to commit drug trafficking offenses); *United States v. Granderson*, 511 U.S. 39, 56 (1994) (applying rule to hold that statute fixed maximum authorized imprisonment upon revocation of probation at lesser of two possibilities, when this interpretation was "not flawless," but "securely plausible").

Lenity applies where "a reasonable doubt persists about a statute's intended scope even *after* resort to the language and structure, legislative history, and motivating policies of the statute." *Moskal v. United States,* 498 U.S. 103, 108 (1990) (internal quotation marks omitted). While many courts' readings of the statute suggest that, after 2003, maximum sentences suddenly reset with each revocation,

that multiplying of possible punishment is too drastic to accept at face value with no explication or evidence of congressional intent. *See Simpson*, 435 U.S. at 15-16.

Thus, the interpretative analysis above provides a compelling counterpoint to any "per-revocation" construction of the statute. And, surely, an unexplained reset each time a court revokes supervision amounts to a colossal increase in allowable punishment where each new reincarceration increment needs only a preponderance-of-the-evidence finding. As such, that reading should be rejected, or alternatively, the statute should be held unconstitutional based on the following.

**B.      Should § 3583(e)(3) be read to allow repeated resetting of the statutory maximum revocation sentence, it violates the Fifth and Sixth amendments.**

The Supreme Court in *Haymond* held unconstitutional another revocation provision, § 3583(k). *United States v. Haymond*, 139 S. Ct. 2369 (2019) (plurality opinion). That section purported to authorize a mandatory minimum term of imprisonment upon revocation of supervised release based on a judge's finding by a preponderance of the evidence. *Id.* at 2373; *id.* at 2386 (Breyer, J., concurring in the judgment).

The main opinion noted that § 3583(k), first added by the PROTECT Act and amended in 2006, required a sentence of at least five years and allowed a sentence of up to life. *Id.* at 2374-2375. *Haymond* observed that judicial authority to punish is

fundamentally derived from a "jury's factual findings of criminal conduct." *Id.* at 2376.

This relationship carried on to parole wherein "the prison sentence a judge or parole board could impose for a … [supervision] violation normally could not exceed the remaining balance of the term of imprisonment already authorized by the jury's verdict." *Id.* at 2377. "[E]ven these developments did not usually implicate the historic concerns of the Fifth and Sixth Amendments." *Id.*; U.S. Const. amends. V, VI. *Haymond* connected this precept to *Apprendi* and *Booker*,[6] stating that the "Court has not hesitated to strike down other innovations that fail to respect the jury's supervisory function." *Id.* at 2377. Here, like in *Haymond*, a constantly resetting statutory maximum is just the sort of innovation, which would bypass and usurp the jury's supervisory role of punishment.

At the very best, § 3583(e)(3)'s 2003 amendment leaves a gap in authority wherein no conceivable balance of a sentence exists from which a judge may continue to exert the limited authority coming from a jury's verdict or equivalent guilty plea. Where a person on supervised release has been given a finite supervised release term with a maximum possible reimprisonment term that also appears finite, it violates

---

[6] *Apprendi v. New Jersey*, 530 U.S. 466 (2005). *United States v. Booker*, 543 U.S. 220 (2005).

the Fifth and Sixth Amendments to allow an endless cycle of reimprisonment with no direct limit. For if § 3583 does not define an aggregate imprisonment limit, it is defined nowhere in the United States Code, *and § 3583(e)(3) amounts to nothing less than a life sentence on the installment plan.*

Thus, were § 3583(e)(3) made subject to a construction permitting such an indefinite, recurring term, it must be recognized as unconstitutional.

## V. THE DISTRICT COURT ERRED IN SENTENCING NEGRÓN BASED ON STATEMENTS HE MADE THAT WERE CRITICAL OF U.S. PROBATION AND THE COURT.

The First Amendment provides that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances." U.S. Const., Amend. I. The First Amendment exists to protect marginalized, unpopular views. *See Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 641 (1994). The First Amendment protects defendants at sentencing. *See generally Dawson v. Delaware*, 503 U.S. 159 (1992). Only in very limited circumstances—none applicable here—are a person's personal views and statements about government conduct relevant to sentencing. Critically,

Justice Blackmun referenced First Amendment activity alongside racial discrimination in various types of proceedings along with the right to a public trial and the trial before an impartial judge. *See Dawson*, 503 U.S. at 169 (Blackmun, J., concurring).

Where the arguments of the government and the probation officer focused on statements critical of Probation and the court, the district court was left with no lawful basis to use those speech acts in fastening a lawful sentence. *See United States v. Álvarez-Núñez*, 828 F.3d 52, 55 (1st Cir. 2016).

Yet, the district court used Negrón's statements to Lozada and in allocution to offer a heightened punishment. First, the court said of Negrón at sentencing that he "continues to be defiant, even during his allocution today …." A203. This followed Negrón's statement regarding the harmful effects probation's enforcement choices have had on his reentry efforts.

Then when delivering its pronouncement wording for its 24-month sentence the court stated that "Mr. Negrón's attitude was completely negative and defiant towards the supervision officer, the supervision process, and the Court." A205. We know from Lozada's narrative and testimony what he meant by defiant. In Lozada's own words, the defiance was expressed by Negrón stating "that he's not in agreement with the conditions of supervision." A120. This statement, as defined by Lozada, meant Negrón "was very defiant." A120.

Lozada further specified that Lozada felt Negrón turned "a little bit defiant in terms of the supervised release conditions" upon their first encounter." A111. "Specifically," explained Lozada, Negrón told Lozada when Lozada tried to get a urine sample from him, "Oh, you already—you don't know what you're doing. Because … the judge eliminated the condition of drug test[ing]." A111.

After a month without internet access, on December 5, Negrón spoke up again. Per Lozada, Negrón "was basically complaining about the lack of employment." A122. Negrón proceeded to laugh at the prospect of finding an actual job without internet and telephone access. A122. Again, Lozada described this expression of opinion as being "very defiant." A122.

The government echoed this in writing, requesting a sentence in its memorandum between 12 and 24 months. The first line of communication with the court read as follows: "Defendant remains resistant, defiant and attempts to justify his continued non-compliance with his conditions of supervised release." A180. The prosecutor again called him "defiant," at the final revocation hearing. A191.

As such, the only reasonable reading of the record is that being defiant refers to Negrón's spoken comments that he should not be wrongfully deprived of access of the internet to live his life and seek and maintain employment and other necessities of life. To make such expressions to a probation officer and a court, here, was

precisely to express a belief in his constitutional rights and petition the government to address his grievances. As such, the 24-month sentence must be vacated.

## CONCLUSION

This Court should reverse the district court's judgment on revocation, reverse the sentence, and strike Special Conditions 31-32.

**RESPECTFULLY SUBMITTED.**

January 19, 2026

**RACHEL BRILL**
Federal Public Defender

**FRANCO L. PÉREZ-REDONDO**
Assistant Federal Public Defender
Supervisor, Appellate Division

**s/KEVIN E. LERMAN**
Assistant Federal Public Defender
First Circuit Bar No. 1194361
241 F.D. Roosevelt Ave.
San Juan, Puerto Rico 00918-2441
(787) 281-4922
Kevin_Lerman@fd.org

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) by containing 11,442 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f). This is less than the 13,000-word limit.

This document complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because it was prepared in a proportionally spaced typeface in Microsoft Word utilizing 14-point Equity font.

January 19, 2026

s/KEVIN E. LERMAN
Assistant Federal Public Defender

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that a true and exact copy of this APPELLANT'S BRIEF was filed with the Clerk of Court on January 19, 2026, using the CM/ECF system which will send notification to all parties of record, including counsel for the appellee.

January 19, 2026

s/KEVIN E. LERMAN
Assistant Federal Public Defender

# In the United States Court of Appeals for the First Circuit

---

**UNITED STATES OF AMERICA,**
*Appellee,*

v.

**ALEXIS D. NEGRÓN-CRUZ,**
*Defendant-Appellant.*

---

On Appeal from the United States District Court
for the District of Puerto Rico
D. Ct. No. 11-cr-229-FAB
Hon. Francisco A. Besosa, U.S. Senior District Judge

---

**ADDENDUM TO APPELLANT'S OPENING BRIEF**

---

**RACHEL BRILL**
Federal Public Defender
District of Puerto Rico
241 F.D. Roosevelt Ave.
San Juan, PR 00918
T. (787) 281-4922
F. (787) 281-4899
E. Kevin_Lerman@fd.org

**FRANCO L. PÉREZ-REDONDO**
Assistant Federal Public Defender
Supervisor, Appeals Section

**KEVIN E. LERMAN**
Assistant Federal Public Defender

*Attorneys for Defendant-Appellant*
**ALEXIS D. NEGRÓN-CRUZ**

# CONTENTS

**Order Re: Ex Parte Comm.** (Feb. 1, 2024), ECF No. 471 ...................................1-2

**Judgment** (Dec. 18, 2024), ECF No. 556.............................................................3-8

```
MIME-Version:1.0
From:prd_docketing@prd.uscourts.gov
To:prd_docketing@prd.uscourts.gov
Bcc:
--Case Participants: Jenifer Yois Hernandez-Vega (arlene.rosado@usdoj.gov,
caseview.ecf@usdoj.gov, jenifer.hernandez@usdoj.gov), Kevin E. Lerman (karen_frame@fd.org,
kevin_lerman@fd.org), Andrew S. McCutcheon (andrew_mccutcheon@fd.org, janely_rosa@fd.org,
rosangeles_sanchez@fd.org), Normary Figueroa-Rijo - INACTIVE (usapr.inactiveusa@usdoj.gov),
Rafael Anglada-Lopez (angladalr@yahoo.com), Joseph L. Russell (caseview.ecf@usdoj.gov),
Federal Public Defender Office (elizabeth_molina@fd.org, prx_notifications@fd.org,
rafael_rivera@fd.org), Senior Judge Francisco A. Besosa (prd_fab@prd.uscourts.gov), US
Magistrate Judge Marcos E. Lopez (prd_mel@prd.uscourts.gov)
--Non Case Participants: ad hoc (prp_probation@prp.uscourts.gov)
--No Notice Sent:

Message-Id:<8326670@prd.uscourts.gov>
Subject:Activity in Case 3:11-cr-00229-FAB-MEL USA v. Negron-Cruz Order on Motion Requesting
Order
Content-Type: text/html
```

**This is an automatic e-mail message generated by the CM/ECF system. Please DO NOT RESPOND to this e-mail because the mail box is unattended.**

**\*\*\*NOTE TO PUBLIC ACCESS USERS\*\*\* Judicial Conference of the United States policy permits attorneys of record and parties in a case (including pro se litigants) to receive one free electronic copy of all documents filed electronically, if receipt is required by law or directed by the filer. PACER access fees apply to all other users. To avoid later charges, download a copy of each document during this first viewing. However, if the referenced document is a transcript, the free copy and 30 page limit do not apply.**

### United States District Court

### District of Puerto Rico

### Notice of Electronic Filing

The following transaction was entered on 2/1/2024 at 3:12 PM AST and filed on 2/1/2024

**Case Name:**    USA v. Negron-Cruz

**Case Number:**   3:11-cr-00229-FAB-MEL

**Filer:**

**Document Number:** 471(No document attached)

**Docket Text:**

**ORDER re [454] Motion Requesting Order as to Alexis D. Negron-Cruz (1). Having reviewed the probation officer's response, this motion is DENIED.** Signed by Senior Judge Francisco A. Besosa on 02/01/2024. (brc)

**3:11-cr-00229-FAB-MEL-1 Notice has been electronically mailed to:**

Rafael Anglada-Lopez      angladalr@yahoo.com

Jenifer Yois Hernandez-Vega      jenifer.hernandez@usdoj.gov, CaseView.ECF@usdoj.gov, arlene.rosado@usdoj.gov

Normary Figueroa-Rijo - INACTIVE     USAPR.InactiveAUSA@usdoj.gov

Andrew S. McCutcheon     Andrew_McCutcheon@fd.org, janely_rosa@fd.org, rosangeles_sanchez@fd.org

Kevin E. Lerman     kevin_lerman@fd.org, karen_frame@fd.org

Federal Public Defender Office     prx_notifications@fd.org, elizabeth_molina@fd.org, rafael_rivera@fd.org

**3:11-cr-00229-FAB-MEL-1 Notice has been delivered by other means to:**

AO 245D (Rev. 09/19)    Judgment in a Criminal Case for Revocations
Sheet 1

# UNITED STATES DISTRICT COURT

District of Puerto Rico

| UNITED STATES OF AMERICA | ) | **JUDGMENT IN A CRIMINAL CASE** |
|---|---|---|
| v. | ) | (For **Revocation** of Probation or Supervised Release) |
| Alexis D. NEGRON-CRUZ (1) | ) | |
| | ) | Case No.  3:11-cr-00229  (FAB) |
| | ) | USM No. 36586-069 |
| | ) | AFPD Joseph Niskar and AFPD Kevin Lerman |
| | ) | Defendant's Attorney |

## THE DEFENDANT:

☐ admitted guilt to violation of condition(s) _____ of the term of supervision.

☑ was found in violation of condition(s) count(s)  See below  after denial of guilt.

The defendant is adjudicated guilty of these violations:

| Violation Number | Nature of Violation | Violation Ended |
|---|---|---|
| Standard condition 4 | Defendant not answering truthfully to the probation officer. | 01/10/2024 |
| Standard condition 7 | Defendant did not work or was not attempting to find a job. | 01/10/2024 |
| Standard condition 13 | Defendant did not follow the instructions of the probation officer. | 01/10/2024 |
| Special condition 31 | Defendant did not immediately notify the probation officer upon registration for access to the internet. | 01/10/2024 |

The defendant is sentenced as provided in pages 2 through ___6___ of this judgment.  The sentence is imposed pursuant to the Sentencing Reform Act of 1984.

☐ The defendant has not violated condition(s) _____ and is discharged as to such violation(s) condition.

It is ordered that the defendant must notify the United States attorney for this district within 30 days of any change of name, residence, or mailing address until all fines, restitution, costs, and special assessments imposed by this judgment are fully paid.  If ordered to pay restitution, the defendant must notify the court and United States attorney of material changes in economic circumstances.

Last Four Digits of Defendant's Soc. Sec. No.: _____

Defendant's Year of Birth: _____

City and State of Defendant's Residence: _____

| | |
|---|---|
| | 12/18/2024 |
| | Date of Imposition of Judgment |
| | /S/ FRANCISCO A. BESOSA |
| | Signature of Judge |
| | Hon. Francisco A. Besosa, Senior U.S. District Judge |
| | Name and Title of Judge |
| | 12/18/2024 |
| | Date |

AO 245D (Rev. 09/19)    Judgment in a Criminal Case for Revocations
                        Sheet 1A

Judgment—Page  2  of  6

DEFENDANT:  Alexis D. NEGRON-CRUZ (1)
CASE NUMBER:  3:11-cr-00229  (FAB)

## ADDITIONAL VIOLATIONS

| Violation Number | Nature of Violation | Violation Concluded |
|---|---|---|
| Special condition 32 | Defendant possessed a device with internet access capability other than those enabled by USPO to monitor and filter any internet accessing. | 01/10/2024 |

Addendum 4

AO 245D (Rev. 09/19)    Judgment in a Criminal Case for Revocations
Sheet 2— Imprisonment

Judgment — Page ___3___ of ___6___

DEFENDANT:  Alexis D. NEGRON-CRUZ (1)
CASE NUMBER:  3:11-cr-00229  (FAB)

# IMPRISONMENT

The defendant is hereby committed to the custody of the Federal Bureau of Prisons to be imprisoned for a total term of :

Twenty-four (24) months.

☑  The court makes the following recommendations to the Bureau of Prisons:

Defendant to complete his term of imprisonment at MDC Guaynabo.

☑  The defendant is remanded to the custody of the United States Marshal.

☐  The defendant shall surrender to the United States Marshal for this district:

☐  at _____  ☐  a.m.  ☐  p.m.  on _____ .

☐  as notified by the United States Marshal.

☐  The defendant shall surrender for service of sentence at the institution designated by the Bureau of Prisons:

☐  before 2 p.m. on _____ .

☐  as notified by the United States Marshal.

☐  as notified by the Probation or Pretrial Services Office.

# RETURN

I have executed this judgment as follows:

Defendant delivered on _____ to _____

at _____ with a certified copy of this judgment.

_____
UNITED STATES MARSHAL

By _____
DEPUTY UNITED STATES MARSHAL

Addendum 5

AO 245D (Rev. 09/19)    Judgment in a Criminal Case for Revocations
                        Sheet 3 — Supervised Release

Judgment—Page ___4___ of ___6___

DEFENDANT:  Alexis D. NEGRON-CRUZ (1)
CASE NUMBER:  3:11-cr-00229  (FAB)

## SUPERVISED RELEASE

Upon release from imprisonment, you will be on supervised release for a term of :

 Two-hundred and sixty-eight (268) months under the standard and special conditions previously imposed on him but without the drug testing condition.

## MANDATORY CONDITIONS

1.  You must not commit another federal, state or local crime.
2.  You must not unlawfully possess a controlled substance.
3.  You must refrain from any unlawful use of a controlled substance. You must submit to one drug test within 15 days of release from imprisonment and at least two periodic drug tests thereafter, as determined by the court.
    ☑ The above drug testing condition is suspended, based on the court's determination that you pose a low risk of future substance abuse. *(check if applicable)*
4.  ☐ You must make restitution in accordance with 18 U.S.C. §§ 3663 and 3663A or any other statute authorizing a sentence of restitution. *(check if applicable)*
5.  ☑ You must cooperate in the collection of DNA as directed by the probation officer. *(check if applicable)*
6.  ☐ You must comply with the requirements of the Sex Offender Registration and Notification Act (34 U.S.C. § 20901, *et seq.*) as directed by the probation officer, the Bureau of Prisons, or any state sex offender registration agency in the location where you reside, work, are a student, or were convicted of a qualifying offense. *(check if applicable)*
7.  ☐ You must participate in an approved program for domestic violence. *(check if applicable)*

You must comply with the standard conditions that have been adopted by this court as well as with any other conditions on the attached page.

**Addendum 6**

AO 245D (Rev. 09/19)    Judgment in a Criminal Case for Revocations
Sheet 3A — Supervised Release

Judgment—Page ___5___ of ___6___

DEFENDANT:  Alexis D. NEGRON-CRUZ (1)
CASE NUMBER:  3:11-cr-00229  (FAB)

## STANDARD CONDITIONS OF SUPERVISION

As part of your supervised release, you must comply with the following standard conditions of supervision. These conditions are imposed because they establish the basic expectations for your behavior while on supervision and identify the minimum tools needed by probation officers to keep informed, report to the court about, and bring about improvements in your conduct and condition.

1. You must report to the probation office in the federal judicial district where you are authorized to reside within 72 hours of your release from imprisonment, unless the probation officer instructs you to report to a different probation office or within a different time frame.
2. After initially reporting to the probation office, you will receive instructions from the court or the probation officer about how and when you must report to the probation officer, and you must report to the probation officer as instructed.
3. You must not knowingly leave the federal judicial district where you are authorized to reside without first getting permission from the court or the probation officer.
4. You must answer truthfully the questions asked by your probation officer.
5. You must live at a place approved by the probation officer. If you plan to change where you live or anything about your living arrangements (such as the people you live with), you must notify the probation officer at least 10 days before the change. If notifying the probation officer in advance is not possible due to unanticipated circumstances, you must notify the probation officer within 72 hours of becoming aware of a change or expected change.
6. You must allow the probation officer to visit you at any time at your home or elsewhere, and you must permit the probation officer to take any items prohibited by the conditions of your supervision that he or she observes in plain view.
7. You must work full time (at least 30 hours per week) at a lawful type of employment, unless the probation officer excuses you from doing so. If you do not have full-time employment you must try to find full-time employment, unless the probation officer excuses you from doing so. If you plan to change where you work or anything about your work (such as your position or your job responsibilities), you must notify the probation officer at least 10 days before the change. If notifying the probation officer at least 10 days in advance is not possible due to unanticipated circumstances, you must notify the probation officer within 72 hours of becoming aware of a change or expected change.
8. You must not communicate or interact with someone you know is engaged in criminal activity. If you know someone has been convicted of a felony, you must not knowingly communicate or interact with that person without first getting the permission of the probation officer.
9. If you are arrested or questioned by a law enforcement officer, you must notify the probation officer within 72 hours.
10. You must not own, possess, or have access to a firearm, ammunition, destructive device, or dangerous weapon (i.e., anything that was designed, or was modified for, the specific purpose of causing bodily injury or death to another person such as nunchakus or tasers).
11. You must not act or make any agreement with a law enforcement agency to act as a confidential human source or informant without first getting the permission of the court.
12. If the probation officer determines that you pose a risk to another person (including an organization), the probation officer may require you to notify the person about the risk and you must comply with that instruction. The probation officer may contact the person and confirm that you have notified the person about the risk.
13. You must follow the instructions of the probation officer related to the conditions of supervision.

## U.S. Probation Office Use Only

A U.S. probation officer has instructed me on the conditions specified by the court and has provided me with a written copy of this judgment containing these conditions. For further information regarding these conditions, see *Overview of Probation and Supervised Release Conditions*, available at: www.uscourts.gov.

Defendant's Signature _____    Date _____

Addendum 7

AO 245D (Rev. 09/19)    Judgment in a Criminal Case for Revocations
Sheet 3D — Supervised Release

Judgment—Page __6__ of __6__

DEFENDANT:  Alexis D. NEGRON-CRUZ (1)
CASE NUMBER: 3:11-cr-00229  (FAB)

## SPECIAL CONDITIONS OF SUPERVISION

1. He shall observe the standard condition of supervised release recommended by the United States Sentencing Commission and adopted by this Court.

2. Mr. Negron-Cruz shall comply with all the special conditions previously imposed.

3. Drug testing condition will not be imposed.

Addendum 8